UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DUJUAN THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:07–0221 |
| | ) | Judge Trauger |
| v. | ) | |
| | ) | |
| DAVIDSON TRANSIT ORGANIZATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the court is the defendant Davidson Transit Organization's (DTO's) Motion for Summary Judgment (Docket No. 88). For the reasons discussed herein, this motion will be granted, and this case will be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Dujuan Thompson, began working for the defendant DTO as a bus operator on January 8, 1995.[1] DTO provides bus operators and other personnel to the Metropolitan Transit Authority (MTA) and DTO bus operators are responsible for, among other things, driving buses for the MTA in and around Nashville, Tennessee. During his employment with DTO, the plaintiff was a member of the Amalgamated Transit Union, Local 1235 (ATU).

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 90 and 99) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). As discussed in a previous Order (Docket No. 93), DTO has provided a very thorough statement of material facts. While considerable factual background is necessary, it is not necessary here to provide the depth of detail provided by DTO.

1

Beginning in 2004, DTO Operations Manager Dawn Distler was the plaintiff's supervisor.

Beginning in 2006, the plaintiff initiated efforts to remove ATU as the exclusive bargaining representative of DTO employees. Specifically, the plaintiff attempted to form his own union, the Davidson Transit Association (DTA), and, on January 23, 2006, he filed a petition with the National Labor Relations Board (NLRB) seeking an election to designate DTA as the exclusive bargaining representative for DTO employees. The plaintiff sought to create this new union because he believed that Bob Baulsir and Lora Baulsir, who are married and DTO management employees, were working in tandem to deny all grievances filed by union members and to deny other benefits such as sick days, personal days, and favorable pension terms. The plaintiff did not believe that ATU was appropriately addressing these issues, and he discussed these and other related problems at organizational meetings. The plaintiff believed that new union representation would result in happier employees serving the Nashville area and would also result in the reduced chance of a bus operator strike.

After the election, the plaintiff planned to hand off control of DTA to the Teamsters. However, on May 17, 2006, the plaintiff withdrew his representation petition under significant pressure from other DTO employees to do so. The plaintiff claims that, while he was on suspension in March/April 2006, DTO employees became afraid that a change of union leadership would result in the loss of pension benefits and similarly unfavorable results. Unable to reduce these fears upon his return, the plaintiff withdrew the petition. The plaintiff concedes that no one at DTO ever threatened his job over his efforts to form a new union and that his supervisor, Distler, had no knowledge of his efforts to form a new union.

In 2005, consistent with his later efforts to form a new union, the "plaintiff began

speaking in public about low morale at DTO." (Docket No. 99 at 11.) While the plaintiff does not recall the exact dates, he recalls speaking out publicly about issues related to allegedly poor union representation, systematic denial of grievances, reduction in benefits, low morale and the related risk of a bus operator strike. This "speaking out" included radio appearances and appearances before the Metro Council, the NAACP, and various elected representatives. One notable appearance occurred on October 8, 2006, when the plaintiff, along with a few other DTO bus operators, appeared on a radio show (to address these same issues) in Nashville, Tennessee on station WVOL 1470, while also being filmed by local television stations.

Again, it is not disputed that the plaintiff's supervisor, Distler, did not know that the plaintiff was one of the employees interviewed on the radio show. It is also undisputed that, while she saw the television broadcast related to the radio interview and heard the complaints, she believed that the employees were within their rights to complain, and she "did not perceive the interviews as a problem and did not pursue the issues." (Docket No. 99 at 15.)

Around the same time, the plaintiff was also subject to a series of minor disciplinary actions at work. For instance, on January 23, 2006, the same day that the plaintiff filed his representation petition with the NLRB, the plaintiff's vehicle was towed from a handicapped spot at DTO, where the plaintiff's mother (who had a handicapped placard) had left the car for the plaintiff. The plaintiff, however, does not believe that anyone at DTO (including the Safety Manager who would have ordered the tow) knew about his visit to the NLRB at the time that his vehicle was towed, and the reasons for the tow remain unclear.[2]

---

[2]Attached to his response to DTO's motion, the plaintiff has filed documents indicating that a copy of the plaintiff's NLRB petition was faxed by the NLRB to DTO's counsel in St. Louis, Missouri, on the afternoon of January 23rd. (Docket 97 Ex. 1 at 3.) There is no credible

3

The next day, the plaintiff received a verbal caution from Distler (which was noted in his personnel file) for using profanity in the workplace after the plaintiff was heard swearing about his car being towed. Besides this warning, no further disciplinary action was taken in relation to this incident. On February 8, 2006, the plaintiff also received, from Distler, a written warning for not conducting a required "pre-check" of the major systems on his bus before commencing his route. While the plaintiff disputes the factual basis for the warning, he concedes that no further disciplinary action was taken in relation to this incident. Also, on February 12, 2006, the plaintiff received a verbal reprimand for talking on his cell phone while driving the bus. The plaintiff claims that he should not have been cited for this because he was talking to his dispatcher.

The plaintiff was also subject to more serious disciplinary action. On February 23, 2006, Distler suspended the plaintiff for one day after DTO received an (accurate) complaint from a customer that a bus operated by the plaintiff had never arrived at its scheduled stop. The scheduled stop was toward the end of the plaintiff's route and, at the time that the plaintiff broke off of his route and returned to DTO, there were no passengers aboard the bus. The plaintiff maintains that it was common and standard practice for drivers to not "run their route[s] to completion" if no passengers were aboard the bus. (Docket No. 99 at 21.) DTO claims that a memorandum posted for all drivers on February 12, 2006 clearly states that "no scheduled trips or parts of trips are to be cancelled without permission from the supervisor." (*Id*. at 22-23.) The plaintiff claims that he never saw this memo.

---

evidence of a causal connection between DTO's counsel receiving the petition in St. Louis and the plaintiff's car being towed in Nashville around the same time, and the plaintiff's suggestion of a connection is dubious.

4

On March 3, 2006, DTO received a complaint that the bus operated by the plaintiff drove on the shoulder of Interstate 65 in Nashville during rush-hour traffic. Distler investigated the complaint and determined that the plaintiff did indeed drive on the shoulder of the road. She believed that the plaintiff's dashboard camera also demonstrated that, during the same trip, the plaintiff improperly backed up the bus on a main road, drove off of his route, talked on his cell phone, and parked the bus on the side of the road for several minutes, which caused him to miss a trip. On March 6, 2006, the plaintiff, his union representative, and Distler met to discuss the events of March 3rd. The plaintiff conceded to driving on the shoulder, but stated that it was common practice to do so and that he only did so to get around traffic and keep the bus on time. Distler asked the plaintiff to put his version of the events in writing.

In this writing, the plaintiff again conceded to driving on the shoulder of the highway to get around traffic, and he did not deny backing the bus down a main road. (Docket No. 90 Ex. Z.) The plaintiff also claimed that he was driving an additional route on March 3rd, and some observed errors could be justified by the fact that he was instructed by another driver to "kill time," that is, stop the bus for a period, while on that route. (*Id.*) After receiving the plaintiff's explanation, Distler terminated the plaintiff on March 9, 2006. DTO and ATU later agreed to convert the termination to a one-month suspension, and the plaintiff returned to work on April 24, 2006, with two weeks back pay.

In June 2006, several weeks after the plaintiff returned to work, Mary Smith, a bus operator, approached Distler to complain that the plaintiff had made an inappropriate gesture and a sexual comment toward her. Distler referred Smith to Ed Oliphant, who was responsible for addressing such matters at DTO. On June 30, 2006, Smith filed a formal complaint with

5

Oliphant. In the complaint, Smith claimed that, on the day of the incident, in the driver's hall, she observed the plaintiff not wearing shoes and told him that his feet smelled like popcorn and that he should put his shoes on. Smith claimed that the plaintiff responded to this suggestion by standing up, shaking his crotch at Smith and telling her (crassly) to engage in oral sex with him.

Oliphant investigated Smith's complaint and received some conflicting witness testimony. For instance, one witness, initially identified by Smith, told Oliphant that the plaintiff had told Smith to "suck his *toes*," which would be somewhat less crass and inappropriate. At least two witnesses, however, supported Smith's account. In his written submission to DTO regarding the incident, the plaintiff claims that he reacted to Smith's comment about his foot odor by pulling up his pant leg and asking Smith if she wanted to suck his toe. Oliphant determined that the plaintiff had made a lewd gesture and remark to Smith during a confrontation and forwarded his findings to Human Resources. On October 6, 2006, Distler suspended the plaintiff for 30 days without pay due to the incident with Smith and put the letter notifying the plaintiff of his suspension in his mailbox that day, that is, two days prior to the plaintiff's radio and television appearance. The plaintiff's grievance regarding his suspension was denied by DTO.

On January 15, 2007, after he returned to work from his suspension, the plaintiff was involved in an on-the-job accident in which his bus struck and seriously injured a pedestrian in downtown Nashville. DTO suspended the plaintiff two days later while an investigation was conducted. The DTO Safety Committee, reviewing dashboard camera tape from the accident, determined that the accident was preventable and major and reported its findings to Distler. Distler also reviewed the accident tape and determined that the plaintiff appeared to be at fault,

6

but she requested that the plaintiff submit a written statement regarding the incident. In two submissions, the latter of which was dated February 2, 2007, the plaintiff generally denied that he was at fault, something Distler determined was inconsistent with the tape of the incident.

On February 5, 2007, Distler informed the plaintiff that he was terminated. The plaintiff concedes that, at the time that she terminated the plaintiff's employment, Distler did not know that the plaintiff had attempted to form a new union or that he had been interviewed on the radio, and, while Distler knew that the plaintiff had appeared on television to discuss morale and related issues at DTO, "this fact in no way factored into her decision to terminate" the plaintiff's employment. (Docket No. 99 at 44.) Indeed, for purposes of this motion, the plaintiff does not claim that the February 5, 2007 discipline violated his rights. (Docket No. 98 at 17.)

On February 21, 2007, the plaintiff filed a sworn Voluntary Petition for Chapter 13 Bankruptcy in this District. In Schedule B of that petition (personal property), the plaintiff did not list any potential claims against DTO, even though the schedule required the petitioner to list all "other contingent and unliquidated claims of every nature" and even though, at this time, the plaintiff believed that he had been wrongfully disciplined by DTO. (Docket No. 99 at 46-47.) On April 24, 2007, the Bankruptcy Court approved the plaintiff's Chapter 13 Plan and ordered the plaintiff to pay about 78 percent of his total claimed liabilities to the Trustee over the course of the plan. On November 21, 2007, the Bankruptcy Court dismissed the petition for non-compliance with the terms of the plan. The plaintiff, despite being represented by counsel, never took any action to notify the Trustee or the Bankruptcy Court of his claims against DTO here.

On February 22, 2007, the day after the plaintiff filed his Chapter 13 petition, he filed this lawsuit. (Docket No. 1.) The three-count Amended Complaint (Docket No. 23) alleges that

7

DTO, as a state actor, violated the plaintiff's free speech and free association rights under Section 1983 (counts I and II) by disciplining him in response to his union activities. (Docket No. 23 at 4-5.) Count III alleged "malicious harassment," which the court subsequently dismissed for failure to state a claim. (Docket No. 39.) Initial discovery and summary judgment briefing in this case (in 2008) concerned whether DTO could be considered a state actor for Section 1983 purposes, and, in denying DTO's Motion for Summary Judgment on that issue, the court concluded that, for purposes of this case, DTO is a state actor. (Docket No. 61 at 13-14.) DTO's actual Section 1983 liability is the subject of this round of briefing.

## ANALYSIS

The plaintiff claims that he was disciplined due to his constitutionally protected speech and association in violation of 42 U.S.C. § 1983. The defendant claims that the plaintiff is judicially estopped from asserting these claims, and, even if he was not so estopped, the plaintiff's claims are without merit.[3]

**I.   Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits

---

[3]In its Reply, DTO also suggests that the court does not have jurisdiction over this matter because, in light of the plaintiff's Response, "the only remaining allegedly protected speech is Plaintiff's filing of the representation petition with the NLRB." (Docket No. 101 at 8-9.) DTO argues that, because the plaintiff's remaining claim amounts to a claim for retaliation for engaging in union activity, the NLRB has exclusive jurisdiction over this case. (*Id.* citing *Tamburello v. Comm-Tract Corp.*, 67 F.3d 973, 976 (1st Cir. 1995)). The court disagrees with the basic premise of DTO's argument, that is, the court does not read the plaintiff's Response as abandoning all claims except those based upon the filing of the petition. Rather, as can be clearly seen from the Response and the plaintiff's response to DTO's Statement of Material Facts, the plaintiff continues to allege that his speech on matters of morale and other issues from 2005 forward were linked to the discipline that he received at the workplace.

8

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Judicial Estoppel

### A. Legal Standard

As discussed above, DTO claims that the plaintiff is judicially estopped from asserting his Section 1983 claims here because he failed to identify those claims on his Chapter 13 petition. The judicial estoppel doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation omitted). The

9

Sixth Circuit has explained that judicial estoppel "preserve[s] the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (internal quotation omitted).

Although noting that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," the Supreme Court has identified the following considerations for determining whether to apply judicial estoppel: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (internal quotations omitted). The Supreme Court warned, however, that these factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id*. at 751.

In light of these considerations identified by the Supreme Court, the Sixth Circuit has held that "[t]he doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition." *Browning*, 283 F.3d at 775 (internal quotation omitted).

As indicated above, the Bankruptcy Code requires debtors to file, among other things, "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a

10

statement of the debtor's financial affairs." 11 U.S.C. § 521(a)(1). This "duty of disclosure is a continuing one, and a debtor is required to disclose all potential causes of action" to the bankruptcy court. *Bohanan v. Bridgestone/Firestone North American Tire*, *LLC*, 2007 WL 1091209 at *3 (M.D. Tenn. April 10, 2007)(Wiseman, J) (internal quotation omitted). The disclosure obligations "are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge." *Id*.

The Sixth Circuit has found that judicial estoppel should be applied to bar causes of action that were not disclosed to the bankruptcy court. *See Lewis v. Weyerhaeuser Co.*, 141 Fed. Appx. 420, 425 (6th Cir. 2005) ("This court has previously found that pursuing a cause of action that was not disclosed as an asset in a previous bankruptcy filing creates an inconsistency sufficient to support judicial estoppel.") However, the Sixth Circuit has also held that, even where the above considerations would otherwise dictate that judicial estoppel should apply, its application is "inappropriate when [the] omissions are the result of mere mistakes or inadvertent conduct." *Eubanks v. CBSK Fin. Group*, 385 F.3d 894, 898 (6th Cir. 2004). Mistakes and inadvertence have been found where the debtor "lacks the knowledge of the *factual basis* of the undisclosed claim or where the debtor has no motive for concealment." *Id*. (emphasis added).

On the motive issue, in most cases, the debtor has a motive to conceal and minimize the assets listed on the petition to reduce the potential pool for creditors. *See Lewis*, 141 Fed. Appx. at 426. Nevertheless, courts have held that a motive to conceal does not exist in two situations: (1) where the debtor has made significant efforts to notify the trustee or other parties about the lawsuit, but, for some valid reason, has not corrected his or her asset schedule, and (2) where the debtor is, for whatever reason, paying 100 percent of his or her debt. *See Eubanks*, 385 F.3d at

11

898-99; *Browning*, 283 F.3d at 776 ("[The debtor] will thus receive no windfall as a result of its failure to disclose its claims, because only [its] creditors will receive the distribution of any recovery.")

    **B.    Application**

DTO argues that this is a clear case for judicial estoppel. That is, it is undisputed that the plaintiff did not disclose this potential action on his Chapter 13 petition, and, contrary to any "mistake or inadvertence" argument, the plaintiff obviously knew of the factual basis for his claim, given that he filed this case only one day after he filed the bankruptcy petition. (Docket No. 89 at 4.) DTO also argues that the record reveals no efforts, let alone "significant efforts," to notify the Trustee or other relevant parties about the lawsuit. (*Id.* at 5.) Moreover, DTO argues, the plaintiff received relief from about 22 percent of his claimed debt through the bankruptcy plan, demonstrating that he was not required to pay 100 percent of his debt. (*Id.*)

In response, the plaintiff primarily argues that DTO has waived the right to assert judicial estoppel here because DTO failed to "list estoppel as an affirmative defense in its Answer to the First Amended Complaint." (Docket No. 98 at 3.) Absent a finding of waiver, the plaintiff argues that, because he was ordered to pay 78 percent of his debt, that is, a substantial amount, there should be no inference of "deliberate manipulation" of the system here, and, moreover, there is no "windfall" for the plaintiff here because the plan was dismissed for non-compliance. (Docket No. 98 at 6-7.) In conclusion, the plaintiff cites an Eighth Circuit case for the proposition that invocation of judicial estoppel is an "extraordinary remedy." (*Id.* citing *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1049 (8th Cir. 2006)).

    **I.    Waiver**

Federal Rule of Civil Procedure 8(c) states that, "[i]n responding to a pleading, a party must affirmatively state any . . . affirmative defense, including . . . estoppel." The Sixth Circuit has also noted that "[f]ailure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense." *Horton v. Potter*, 369 F.3d 906, 911-12 (6th Cir. 2004). In addition to *Horton*, the plaintiff provides several cases from other circuits in which the court held that the failure to identify estoppel or other affirmative defenses in the Answer resulted in the waiver of that defense. *See e.g. Jones v. District of Columbia Dept. of Corrections*, 429 F.3d 276, 279-80 (D.C. Cir. 2005)(finding that the failure to identify an affirmative defense in its initial Answer prohibited the defendant from raising it at the summary judgment stage; however, on remand, the defendant could move for leave to amend its Answer in order to assert the defense).

While the Sixth Circuit spoke in broad, general terms in *Horton*, there is also substantial Sixth Circuit authority holding that, "if a plaintiff receives notice of an [unpled] affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice," and the defense is, therefore, not waived. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993)(internal quotation omitted). Indeed, the Sixth Circuit has repeatedly held that where, through the course of the litigation, the plaintiff has become reasonably aware of the affirmative defense, the plaintiff cannot reasonably claim any prejudice from the defendant's failure to plead the defense and, therefore, the defense should not be deemed waived. *See Seals v. GM*, 546 F.3d 766, 770 (6th Cir. 2008)("We have explained, however, that failure to raise an affirmative defense by responsive pleading does not always result in waiver of the defense – such as, when the

13

plaintiff receives notice of the affirmative defense by some other means"); *McCormick v. Braverman*, 451 F.3d 382, 396 (6th Cir. 2006); *Belluardo v. Cox Enters.*, 157 Fed. Appx. 823, 830 (6th Cir. 2005)("the purpose of [Rule 8(c)] is to give the opposing party timely notice of the affirmative defense and the opportunity to respond. . . . The defendants raised their defense as soon as the defense became available. It is inconsequential that they raised it in briefing a dispositive motion instead of in an amended pleading.")

Here, there is no dispute that the plaintiff had substantial notice of the judicial estoppel defense. Most notably, the plaintiff was repeatedly asked about his bankruptcy filing during his July 2009 deposition and was questioned as to whether he had disclosed this litigation in the course of his bankruptcy filing. (Docket No. 100 Ex. 2 at 15-16.) These questions should have put the plaintiff on notice of a judicial estoppel defense in this case. Moreover, as indicated above, courts strictly interpreting Rule 8(c) still permit the defendant to move for leave to amend its Answer to assert the relevant affirmative defense. Therefore, to not allow DTO to assert the estoppel defense here would only result in prolonging the process. DTO would move for leave to amend, the court would presumably grant the motion under the liberal standard outlined in Federal Rule of Civil Procedure 15, and DTO would then re-assert the judicial estoppel argument. Such formalism is unnecessary and counter-productive in light of the facts of this case. Therefore, the court will not deem the judicial estoppel defense waived.[4]

---

[4] The plaintiff also claims that he was prejudiced because "defendant's failure to raise judicial estoppel as an affirmative defense precluded the plaintiff from amending the Chapter 13 bankruptcy petition so as to cure the defect." (Docket No. 98 at 6.) This is not a credible argument. It was the plaintiff's responsibility to identify this cause of action on the bankruptcy petition, with or without the defendant's assistance.

14

### ii. Applicability of the judicial estoppel doctrine

On balance, this is an appropriate case for the imposition of judicial estoppel. There is no dispute that, with full knowledge of his Section 1983 claims, the plaintiff failed to list those claims as assets on his bankruptcy petition. Moreover, there is no dispute that he allowed the bankruptcy proceeding and this litigation to proceed, essentially in tandem, without ever amending his petition to reflect his claims in this case. There is no suggestion that the plaintiff made any effort at any time to notify the bankruptcy trustee or any one else involved in the bankruptcy proceeding of his claims in this case. Also, while his Chapter 13 plan did require the plaintiff to pay a substantial amount of his claimed liabilities, he was not ordered to pay 100 percent of his claimed liabilities and, therefore, here, the plaintiff, as debtor, had a continuing motive to conceal and minimize his assets to reduce the potential pool for creditors.

The only equitable basis for not invoking judicial estoppel here is that, as the plaintiff maintains, the plan was terminated for non-compliance in November 2007, and, therefore, the plaintiff will receive "no windfall" from the omission. As discussed above, the Supreme Court and the Sixth Circuit have concluded that judicial estoppel is a flexible doctrine that is designed to consider all of the circumstances in evaluating whether the plaintiff's inconsistent statements justify estopping the plaintiff from pursuing his claims. To the court, the remarkably close temporal connection between the filing of this case and the bankruptcy petition, the fact that the plaintiff apparently made no efforts to correct the petition, and the clear motive to conceal the claim, in equity, overwhelm the fact that the plaintiff's Chapter 13 plan is no longer in place. Therefore, the court concludes that, on judicial estoppel grounds, this case should be dismissed.

## III.    A Brief Discussion of the Merits

To be clear, the invocation of judicial estoppel is not preventing a plaintiff with otherwise meritorious claims from prevailing. In the absence of the judicial estoppel argument (or if the court had determined the defense to have been waived), the plaintiff's Section 1983 free speech and free association claims would have been analyzed under a well-settled three-part test, and it is clear from that test that the plaintiff's claims should be dismissed. *Akers v. McGinnis*, 352 F.3d 1030, 1036 (6th Cir. 2003)("[s]tate employees' freedom of expressive association claims are analyzed under the same standard as state employees' freedom of speech claims.")

That is, to prove a *prima facie* case of First Amendment retaliation under Section 1983, the plaintiff must show that: (1) the relevant "speech addressed a matter of public concern," (2) on balance, the employee's interest, as a citizen, in commenting on matters of public concern outweighed the state's interest, as an employer, in promoting efficiency, and (3) the speech was a "substantial or motivating factor" in the relevant adverse employment action. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004)(internal quotation omitted). This final prong focuses upon whether the employee can "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 144 (6th Cir. 1997)(internal quotation omitted)**.**   If the plaintiff meets his burden with respect to the three elements, then the burden shifts to the defendant to show that it would have carried out the adverse employment action against the plaintiff, notwithstanding the plaintiff's exercise of protected speech. *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003).

The parties spend a considerable amount of effort briefing whether the plaintiff's speech here raised matters of public concern, which has been defined as "any matter of political, social

or other concern to the community." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 965 (6th Cir. 2002). This is a close question, because, clearly, much of the plaintiff's speech touched on matters of purely private interest to himself and his colleagues, such as their pensions, hours, grievances, and workplace/union satisfaction. That said, the labor satisfaction and the readiness to strike of bus drivers in a city in which a significant number of people depend upon public transportation to conduct their daily affairs seems to raise issues of public concern and, indeed, the fact that the plaintiff and his colleagues were given radio and television time in Nashville to discuss these issues suggests that at least some of the speech at issue involved matters of public concern.

That said, it is not necessary to conclusively resolve this question or the associated balancing because the court can detect no evidence from the record that the plaintiff's speech and associated union activities were a "substantial or motivating" factor in the myriad of disciplinary actions directed at the plaintiff. As indicated above, for every disciplinary action cited by the plaintiff, DTO has come forth with a reasonable explanation (supported by evidence) for the event, and in no instance has the plaintiff brought forth anything other than his own conclusory statements to challenge the sanction.[5] Often, the plaintiff does not dispute that DTO has offered a legitimate explanation for the sanction imposed, but he challenges the sanction on the grounds that his conduct, although improper, was "common" or that "everybody did it." (*See* Docket No. 98 at 15.)

---

[5]Additionally, as DTO suggests, the oral and written warnings associated with the pre-trip inspection, the cell phone use, and the profanity, even if somehow shown to be unjustified, are sufficiently minor that they do not appear to fall within the realm of actionable "adverse" employment actions. *See Jones v. City of Allen Park*, 167 Fed. Appx. 398, 407 (6th Cir. 2006)("minor harassment . . . is not actionable in constitutional cases.")

17

There is no question that, for instance, (1) the plaintiff improperly cut his bus run short on February 23, 2006, (2) improperly drove on the shoulder of the freeway during rush hour on March 3, 2006, (3) said something clearly inappropriate to a female co-worker in June 2006, and (4) was involved in an accident that left a pedestrian seriously injured on February 5, 2007. In short, a review of the record leaves the court with the sense of a complete divorce between the plaintiff's union organizing/speech on issues of morale and the discipline that the plaintiff received. This sense is only heightened by the fact that the plaintiff concedes that Distler, who was his supervisor and made the decisions regarding discipline, had little, if any, familiarity with the plaintiff's efforts to establish a new union or with his speech on issues of morale. Even if judicial estoppel was not an appropriate basis for dismissing this action, the court would still grant summary judgment to DTO on the merits.

## CONCLUSION

For the reasons discussed herein, DTO's Motion for Summary Judgment will be granted and this case will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge